**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re: ) | |
| ) | Case No. 12-11013 MER |
| WILLIAM GARY KING ) | |
| JULIA CAROLYN KING ) | Chapter 7 |
| ) | |
| Debtors. ) | |
| ) | |
| COUNTRY BANK ) | Adversary No. 12-1248 MER |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| WILLIAM GARY KING ) | |
| JULIA CAROLYN KING ) | Signed/Docketed |
| ) | December 11, 2013 |
| Defendants. ) | |

**ORDER**

THIS MATTER came before the Court for trial on the question of whether the Defendants herein acted in a fraudulent manner when they represented they owned certain mobile home lots on a financial statement when, in fact, the lots were owned by a retirement trust.  The Plaintiff argues the mischaracterization was an attempt to deceive.  The Defendants contend their mischaracterization lots was an honest mistake.  The issues before the Court are whether the Defendants acted with the requisite fraudulent intent, and whether the Plaintiff's reliance on the Defendants' representation of ownership was justifiable under 11 U.S.C. § 523(a)(2)(A) or reasonable under 11 U.S.C.  § 523(a)(2)(B).[1]

**JURISDICTION**

The Court has jurisdiction over this matter under 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b).  This is a core proceeding under 28 U.S.C. § 157(b)(2)(I), as it involves a proceeding to determine the dischargeability of a particular debt.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

---

[1] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

## BACKGROUND FACTS[2]

In 2006, BJAS Properties, LLC ("BJAS")[3] obtained a commercial real estate loan (the "Loan") in the amount of $241,500 from the Country Bank (the Bank"), for the purchase of undeveloped real property in Arizona known as the Headwaters Ranch Property. The Loan was personally guaranteed by the Defendants, William Gary King and Julia Carolyn King (the "Kings"). At the time of the closing on March 16, 2006, the appraised value of the Headwaters Ranch Property was $490,000. The purchase price paid for the Headwaters Property was $345,000, comprised of a down payment of $105,676.67 made by the Kings, and the $241,500 Loan.[4] The Loan was renewed in 2007 and 2008, and for a three-year term in 2009. BJAS and the Kings defaulted on the Loan in 2011.

As part of the Loan approval process, the Kings provided the Bank with four personal financial statements.[5] Among the assets listed on the Kings' personal financial statements were six unencumbered mobile home lots in Grand Junction, Colorado (the "Lots"). At the time of the Loan negotiation, the Lots had an aggregate value between $200,000 and $250,000. The Bank did not secure the Lots as collateral for the Loan.

However, the Lots were not owned by the Kings. Rather, title resided with the William King Retirement Plan and Trust, a self-directed, profit-sharing 401(k) plan established by Mr. King on July 29, 2002 (the "Retirement Plan"). Mr. King was the sole participant and co-trustee of the Retirement Plan, along with Mrs. King. The Bank learned of the true ownership of the Lots following the 2011 default.

---

[2] The background facts are taken primarily from the parties' Stipulated Pretrial Statement, Docket No. 44.

[3] BJAS is comprised of the King Family Trust No. SSB-1, Aaron King, and Sara Schifino-King. Aaron King and Sara Schifino-King are the Kings' son and daughter-in-law.

[4] These figures are from the parties' stipulated facts appearing in their Pretrial Statement. See Pretrial Statement, Docket No. 44, p. 4, ¶ 13. The $2,176.67 difference in the purchase price and the price paid by the down payment and the loan were not explained, but the discrepancy not relevant for purposes of this opinion.

[5] Plaintiff's Exhibits 9 -12.

## DISCUSSION

**A.     Section 523(a)(2)(A)**

To establish the Bank's debt is nondischargeable under § 523(a)(2)(A), the Bank must prove the following elements:  1) the Kings[6] made a false representation or material omission; 2) the Kings made the representation or omission with the intent to deceive the Bank; 3) the Bank relied on the representation; 4) the Bank's reliance was justifiable; and 5) the Kings' representation or omission caused the bank to sustain damages.[7]  The standard of proof is preponderance of the evidence.[8]

As noted above, there is no dispute the Lots belonged to the Retirement Plan, not the Kings individually.  Further, the parties do not dispute the Lots' ownership by the Retirement Plan makes them exempt from attachment by the Bank, resulting in damages if the Bank cannot collect its debt from the collateral or guarantors.  The only issues are whether the Kings intended to deceive the Bank, and whether the Bank justifiably relied on the representation of the Lots' ownership.

   *1.     Intent to Deceive*

It would be extremely rare for a defendant to admit he intended to deceive another.  Therefore, intent to deceive may be inferred from a totality of the circumstances.[9]

In this case, the Court finds the testimony of Mr. King and Mrs. King to be credible, and believes the error in listing the Lots was not made with any intent to deceive the Bank.  Specifically, Mr. King testified he believed he and the Retirement Plan were one and the same because he was only member of the

---

[6] The Court recognizes the dischargeability analysis must be applied to each individual debtor.  In this case, since the Loan was jointly requested and virtually all relevant actions were taken by both debtors, the debtors are collectively referenced in this Opinion.

[7] *Johnson v. Riebesell (In re Riebesell)*, 586 F.3d 782, 789 (10th Cir. 2009); and *Fowler Bros. v. Young (In re Young)*, 91 F.3d 1367, 1373 (10th Cir. 1996)).  *See also Field v. Mans*, 516 U.S. 59, 74-75 (1995) (clarifying § 523(a)(2)(A) requires justifiable, rather than reasonable, reliance).

[8] *Grogan v. Garner*, 498 U.S. 279, 286 (1991).  *See also Martin v. Hauck (In re Hauck)*, 489 B.R. 208 (D. Colo. 2013); *Diamond v. Vickery (In re Vickery)*, 488 B.R. 680 (10th Cir. BAP 2013); *Knaub v. Golba and Rollison (In re Golba)*, 473 B.R. 366 (Bankr. D. Colo. 2012).

[9] *Riebesell*, *supra*, at 791 (citing *Young*, *supra*, at 1375).

Retirement Plan. He noted he moved the Retirement Plan's checking account to the Bank in 2007 at the Bank's request, and provided the Bank a copy of the Retirement Plan and Standardized Adoption Agreement.[10]

Mrs. King, who has accounting training, was the one who completed the Loan applications and financial statements. She listed the Retirement Plan's checking account in the "cash in the bank" category and the Lots in the "real estate" category, instead of lumping the checking account and Lots in a separate category for retirement assets. Ms. King believed her characterization of these assets was accurate.

According to Mrs. King, the value of the Lots was excluded from the Kings' net worth in a subsequent 2010 loan application for the Kings' Colorado home because a loan officer informed her they were property of the Retirement Plan. At the time of the Loan with the Bank; however, Mrs. King believed the Lots belonged to Mr. King. Further, until May 5, 2011, Mrs. King believed the Retirement Plan's bank account and the Lots were exempt from the Bank's claims.

The Kings made regular payments on the Loan and, when the Loan was renewed, they complied with the Bank's request for additional payments to reduce the principal. The Kings voluntarily caused a total of approximately $44,000 from the cash held in the Retirement Plan to be used to purchase certificates of deposit to be placed with the Bank, which the Bank then considered as "curtailment payments." These payments do not indicate an intent to deceive.

Based on these findings, the Court finds the Kings lacked the requisite intent to deceive under § 523(a)(2)(A).

    2.    *Justifiable Reliance*

However, even if the Kings' intent had been demonstrated, the Court finds the Bank's reliance on the Kings' listing of the Lots as being owned individually was not justifiable.

One of the most important distinctions between §§ 523(a)(2)(A) and (B) is the "reasonable reliance" standard set forth § 523(a)(2)(B) does not apply to § 523(a)(2)(A). Instead, § 523(a)(2)(A) employs the lesser standard of

---

[10] *See* Stipulated Pretrial Statement, p. 5, ¶¶ 18 and 20.

"justifiable reliance."[11] The Supreme Court has made the following observation regarding justifiable reliance under § 523(a)(2)(A), and by inference, reasonable reliance under § 523(a)(2)(B):

> The Restatement expounds upon justifiable reliance by explaining that a person is justified in relying on a representation of fact "although he might have ascertained the falsity of the representation had he made an investigation." . . . "Although the plaintiff's reliance on the misrepresentation must be justifiable . . . this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases." . . . Justifiability is not without some limits, however. . . . [A] person is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.[12]

The United States Court of Appeals for the Tenth Circuit has explained: "The appropriate standard is not 'reasonableness' in the sense of whether an objectively reasonable person would have relied upon the debtor's false representations. Rather, the correct inquiry is whether the actual creditor's reliance was 'justifiable' from a subjective standpoint."[13] In addition, as noted by Chief Judge Howard R. Tallman of this Court,

> In order for the Plaintiff to have justifiable reliance on a representation under 11 U.S.C. § 523(a)(2)(A), the Plaintiff need only perform a cursory inspection of the representation to the extent that it should be very obvious that the representation is fraudulent. *Field v. Mans*, 516 U.S. 59, 71, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is not reasonable reliance, so the objective reasonable person standard does not apply; it is merely what a cursory examination of the representation would uncover. *Id.* at 72, 116 S.Ct. 437.[14]

---

[11] *Field*, *supra*, at 70; *GDO Investments, Inc. v. Glasgow (In re Glasgow)*, 370 B.R. 362, 371 (Bankr. D. Colo. 2007).

[12] *Field*, *supra*, at 70–71 (quoting Restatement (Second) of Torts, §§ 537, 540, 541 and 545A ).

[13] *Riebesell*, *supra*, at 791-92.

[14] *Adams County Dept. of Social Services v. Sutherland-Minor (In re Sutherland-Minor)*, 345 B.R. 348, 354, n.4 (Bankr. D. Colo. 2006). *See also Young,* 91 F.3d

In this case, Mr. Burton, the Bank's chief credit officer, and Mr. Beyea, the Bank's loan officer, each testified the Loan would not have been made had they known the Lots were owed by the Retirement Plan. They pointed out the Lots were the only unencumbered real property listed by the Kings. They each indicated they had relied on the representations the Lots were owned by the Kings individually.

However, the Court finds the Bank's reliance was not justifiable. The Lots were never to be encumbered by the Loan. Even had the representations been accurate when made, the Kings could have fully encumbered the Lots the day after the Loan closed, eliminating them from any possible source of recovery by the Bank.

Further, as Mr. Burton acknowledged, the original promissory note for the Loan, in the amount of $241,500, listed the borrower as BJAS, and was executed by Mr. King and Ms. King "as members of their trust."[15] The Bank did not, however, ask or investigate whether the Kings had other trusts or any retirement plans. Moreover, the Bank, in verifying the ownership of the Lots, obtained only the lot lease agreements. Such agreements did not indicate the ownership of the property; rather they merely identified Mr. King as the landlord.[16]

The Bank never asked for ownership and encumbrance ("O & E") reports for the Lots. Mr. Burton stated that to do so would involve a subscription to a Mesa County, Colorado website and a delay from two to several days. Mr. Burton believed the Kings to be truthful, so he did not require such reports.

Further, the Bank knew of the existence of the Retirement Plan because Mr. King had acceded to its request to move the Retirement Plan's checking account to the Bank and to provide the Bank with a copy of the Retirement Plan

---

at 1373 and *Field*, 516 U.S. at 74.

[15] *See* Transcript, p. 17, lines 14-17, testimony of Mr. Burton.

[16] *See* Transcript p. 32, lines 8–10, testimony of Mr. Burton. *See also* Plaintiff's Exhibits 44-47, Lease Agreements. Under Colorado law, a "landlord" with respect to a mobile home park may mean "the owner or person responsible for operating and managing a mobile home park or an agent, employee, or representative authorized to act on said management's behalf in connection with matters relating to tenancy in the park." Similarly, the Arizona Mobile Home Parks Residential Landlord and Tenant Act defines "landlord" as "the owner, lessor, sublessor or operator, or any combination thereof, of a mobile home park and it also means a manager of the premises who fails to disclose as required by § 33-1432."

and related documents.[17] In fact, rent checks from the lessees of the Lots were deposited into the Retirement Plan's checking account at the Bank.[18]

Despite such red flags, and despite the fact that O & E reports could have easily been obtained over the five years the Loan was active and had been renewed, the Bank never required any documentation of ownership other than the lease agreements. Therefore, the Bank's failure to conduct investigation beyond the lease agreements prevents a finding of justifiable reliance.

### B. Section 523(a)(2)(B)

In order to show the debt nondischargeable under § 523(a)(2)(B), the Bank must show the loan was obtained by the use of a statement in writing: 1) that was materially false; 2) respecting the Kings' or an insider's financial condition; 3) on which the Bank reasonably relied; and 4) that the Kings caused to be made or published with intent to deceive.[19] The standard of proof for this subsection is also preponderance of the evidence.[20]

For the reasons stated above, since the Court has found the Bank has failed to meet the easier justifiable reliance standard required under, § 523(a)(2)(A), it therefore cannot meet the heightened requirements of § 523(a)(2)(B). In addition, and also for the reasons described above, the requisite intent on the part of the Kings has not been shown. Accordingly, this claim must also fail.

### CONCLUSION

Based upon the above findings,

IT IS ORDERED that judgment shall enter in favor of the Defendants and against the Plaintiff, and

---

[17] *See* Transcript pp. 302, line 25 - 303, line 17, testimony of Mr. King.

[18] *See* Transcript p. 293, lines 15-18, testimony of Mr. King.

[19] *See Kaspar v. Bellco First Federal Credit Union (In re Kaspar)*, 125 F.3d 1358, 1359 (10th Cir. 1997); *In re Lucas*, 300 B.R. 526, 531 (10th Cir. BAP 2003); *see generally, In re Joelson*, 307 B.R. 689, 692 (10th Cir. BAP 2004), *aff'd Cadwell v. Joelson*, 427 F.3d 700 (10th Cir. 2005). Note the standard of reliance under this subsection is "reasonable" rather than "justifiable" as under § 523(a)(2)(A).

[20] *Grogan v. Garner*, *supra*, 498 U.S. at 286-87. *See also Colorado East Bank & Trust v. McCarthy (In re McCarthy)*, 421 B.R. 550 (Bankr. D. Colo. 2009).

    IT IS FURTHER ORDERED the Defendants' debt to the Plaintiffs on account of the subject Loan is hereby determined to be dischargeable.

    IT IS FURTHER ORDERED the parties shall bear their own fees and costs.

Dated December 11, 2013                    BY THE COURT:

Michael E. Romero
United States Bankruptcy Judge